UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**
11-14-08
NOV 1 4 2009

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. |
|  | ) |  |
| v. | ) |  |
|  | ) | Magistrate Judge Susan E. Cox |
| JOHN B. OHLE III | ) |  |

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# 08 CR 934

## AFFIDAVIT OF INDICTMENT IN REMOVAL PROCEEDINGS

The undersigned Affiant personally appeared before Susan E. Cox, a United States Magistrate Judge, and being duly sworn on oath, states: That at New York, New York (U.S. District Court for the Southern District of New York), on or about November 13, 2008, one JOHN B. OHLE III was charged by indictment with: (1) violation of Title 18, United States Code, Section 371 for the offense of conspiracy to impede the functions of the Internal Revenue Service ("IRS"); to evade income taxes, in violation of Title 26, United States Code, 7201; and to assist in the presentation to the IRS of materially false and fraudulent tax returns, in violation of Title 26, United States Code, 7206(2); (2) violations of Title 26, United States Code, Section 7201 and Title 18, United States Code, Section 2, for the offense of evasion of income tax; (3) violation of Title 18, United States Code, Section 371 for the offense of conspiracy to commit wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346; to evade income tax, in violation of Title 26, United States Code, 7201; to assist in the presentation to the IRS of materially false returns, in violation of Title 26, United States Code, 7206(2); and to submit fraudulent returns to the IRS, in violation of Title 26, United States Code, 7206(1); and (4) violation of Title 26, United States Code, Section 7212(a) for the offense of obstructing and impeding the administration of the Internal Revenue laws. On the basis of my investigation and information received concerning the case through official channels, I hereby certify that an Arrest Warrant is outstanding for the arrest of said defendant (attached hereto).

AUSA Maureen E. Merin (312) 353-1457

Wherefore, Affiant prays that the defendant be dealt with according to law.

Kenyon Dugan

Shawn Chandler, Special Agent
Internal Revenue Service

Subscribed and Sworn to before me this
14th day of November, 2008.

3:44 pm

Susan E. Cox
United States Magistrate Judge

CR 12 (Rev. 5/03)

# WARRANT FOR ARREST

| **United States District Court** | **DISTRICT** SOUTHERN DISTRICT OF NEW YORK |
|---|---|

| UNITED STATES OF AMERICA<br><br>v.<br><br>**JOHN B. OHLE III** | **DOCKET NO.** 08 CRIM. 1 08 Cr. | **MAGISTRATE'S CASE NO.** 109 |
|---|---|---|

| | **NAME AND ADDRESS OF INDIVIDUAL TO BE ARRESTED**<br><br>**JOHN B. OHLE III** | |

| WARRANT ISSUED ON THE BASIS OF: ☐ Order of Court<br>**XX**☐ Indictment ☐ Information ☐ Complaint | **DISTRICT OF ARREST** Southern District of New York |
|---|---|

| TO: UNITED STATES MARSHAL OR ANY OTHER AUTHORIZED OFFICER | New York City |
|---|---|

**YOU ARE HEREBY COMMANDED** to arrest the above-named person and bring that person before the United States District Court to answer to the charge(s) listed below.

### DESCRIPTION OF CHARGES

Conspiracy to defraud the United States
Tax Evasion
Corruptly endeavoring to impede and obstruct the administration of the Internal Revenue laws

| IN VIOLATION OF | **UNITED STATES CODE TITLE** Title 18 Title 26 | **SECTION** 371 7201 and 7212(a) |
|---|---|---|

| BAIL | OTHER CONDITIONS OF RELEASE | |
|---|---|---|
| ORDERED BY | SIGNATURE (FEDERAL JUDGE/U.S. MAGISTRATE) *S/Kevin Nathaniel Fox* | DATE ORDERED 11-13-08 |
| CLERK OF COURT | (BY) DEPUTY CLERK | DATE ISSUED |

### RETURN

This warrant was received and executed with the arrest of the above-named person.

| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
|---|---|---|
| DATE EXECUTED | | |

Note: The arresting officer is directed to serve the attached copy of the charge on the defendant at the time this warrant is executed.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA      :

      -v-              :      **INDICTMENT**

**JOHN B. OHLE III and**      :
**WILLIAM E. BRADLEY,**      **08 CRIM. 1109**

             :

      **Defendants.**

             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### COUNT ONE
(Conspiracy – The HOMER Tax Shelter Transactions – Defendant JOHN B. OHLE III)

The Grand Jury charges:

### Background

1.    At all times relevant to this Indictment, JOHN B. OHLE III, the defendant, was an attorney, certified public accountant, and resident of Wilmette, Illinois, and New Orleans, Louisiana.

2.    From in or about November 1999 through early 2002, JOHN B. OHLE III, the defendant, was employed by a national bank ("Bank A") in its "Innovative Strategies Group" ("ISG"), which maintained its principal office in Chicago, Illinois. The ISG provided estate planning and tax shelter strategies for high net worth clients, including a tax elimination strategy known as "Hedge Option Monetization of Economic Remainder" or "HOMER." For most of his tenure at ISG, OHLE supervised certain activities of the group,

including the sales of HOMER, and was its lead salesperson.

3.      From in or about February 2002 until approximately 2004, JOHN B. OHLE III, the defendant, co-owned and operated Dumaine Group LLC ("Dumaine"), which maintained its principal office in Chicago, Illinois. Formed in or about February 2002 by OHLE together with several former ISG employees who left Bank A as a result of its termination of the ISG's creation, sale, and implementation of tax shelter strategies, including HOMER, Dumaine was involved principally in the creation, sale, and implementation of tax shelter strategies for high net worth clients.

4.      At all times relevant to this Indictment, Jenkens & Gilchrist, P.C., ("J&G") was a law firm and professional corporation with offices in Dallas, Texas, and Chicago, Illinois, among other locations. In or about late December 1998, Lawyer A, an attorney, certified public accountant, and co-conspirator not named as a defendant herein, resigned together with several other attorneys from another Chicago law firm, and became a shareholder of J&G's newly-formed Chicago office. From in or about early January 1999 until in or about April 1, 2004, Lawyer A served as the managing shareholder of J&G's Chicago office and head of its Chicago tax practice. Lawyer A's practice centered around the creation, sale, and implementation of tax shelter transactions.

5.      Lawyer B, a co-conspirator not named as a defendant herein, was an associate attorney in J&G's Chicago tax practice from June 1999 to November 2004. During his tenure at J&G, Lawyer B, who has a Master's Degree in taxation, worked primarily for

2

Lawyer A and another tax partner in J&G's Chicago office.

6.     Individual A, a co-conspirator not named as a defendant herein, was a childhood friend of JOHN B. OHLE III, the defendant.  OHLE enlisted Individual A to participate in the HOMER tax shelter transaction as the purported unrelated third-party "buyer" of certain assets, as described below.

7.     Bank B, a foreign bank with United States headquarters in New York ("Bank B"), implemented the financial transactions used in the HOMER tax shelter, as described below.

### The HOMER Tax Shelter Transactions

8.     In 2001, members of Bank A's ISG, including JOHN B. OHLE III, the defendant, together with other members of ISG, Lawyers A and B at J&G, and Bank B, engaged in the design, marketing, and implementation of tax shelter transactions, including the HOMER tax shelter transaction.  During 2001, OHLE and his co-conspirators implemented 36 HOMER tax shelter transactions for high net worth clients of Bank A and J&G. In 2002, OHLE implemented two additional HOMER transactions through his newly-created business, Dumaine.

9.     JOHN B. OHLE III, the defendant, and the co-conspirators designed and marketed the HOMER tax shelter as a means for wealthy clients of Bank A and J&G to eliminate or reduce the amount of U.S. income taxes the clients would have to pay to the IRS, and to generate extraordinary fee income for Bank A and J&G, as well as for OHLE and his

3

co-conspirators. Rather than paying U.S. income taxes generally ranging from 20% to 35% of their taxable gains, HOMER clients could choose instead to pay total fees calculated as a percentage of the desired tax loss generated by the tax shelter. The HOMER clients were required to pay fees generally totaling 6%, or 600 basis points, of the tax loss that the clients were seeking to generate through their respective HOMER shelters. The fees were divided among Bank A, J&G, Bank B, and Individual A, among others. OHLE and other ISG members earned bonuses based on, among other things, the amount of fees each generated through their sale of HOMER shelters.

      10.    JOHN B. OHLE III and his co-conspirators marketed the HOMER transaction as a way to eliminate clients' taxes, claiming that it was legitimate because it was also an estate planning technique that, through the use of a trust and the implementation of financial transactions involving a loan and pairs of options, had the ability to produce investment profits for the HOMER clients. In truth and fact, the HOMER transaction was a tax elimination strategy designed to produce tax losses for the clients through a contrived and preordained series of steps that invariably resulted in: losses from the options flowing to the Homer clients in order to offset their taxable income; gains from the options being left with a purportedly unrelated third party who was inserted into the transaction and controlled and funded by OHLE; and no reasonable opportunity for the HOMER clients to make a profit, given the structure of the options transactions and the fees required to be paid to obtain the losses. Moreover, the HOMER clients did not engage in the HOMER transactions

to make a gift of approximately $10,000 to a beneficiary, much less pay hundreds of thousands or millions of dollars of fees to OHLE and his co-conspirators to do so.

11.     JOHN B. OHLE III, the defendant, and his co-conspirators understood that if the IRS were to detect the clients' use of the HOMER tax shelter and learn the true facts and circumstances surrounding its design, marketing, and implementation, the IRS would aggressively challenge the claimed tax benefits, including seeking to impose substantial penalties, in addition to the tax and interest owed.  Accordingly, OHLE and his co-conspirators undertook to prevent the IRS from: (a) detecting their clients' use of these shelters; (b) understanding how the steps of the transaction operated to produce the purported tax benefits claimed by the clients; (c) learning that these shelters were marketed as cookie-cutter products that would significantly reduce or eliminate the clients' tax obligations; (d) learning that any potential gain from the transactions could never overcome the total fees required to engage in the HOMER tax shelter; (e) learning that the clients were not genuinely seeking profit-making investment opportunities, but were, instead, seeking huge tax benefits, and (f) learning that from the outset the clients intended to complete a preplanned series of steps that had been designed by OHLE and his co-conspirators to lead to the specific tax losses sought by the clients.

12.     In order to maximize the appearance that the HOMER tax shelter was an investment undertaken to generate profits, and to minimize the likelihood that the IRS would learn the HOMER transaction was actually designed to create tax losses, JOHN B.

5

OHLE III, the defendant, and his co-conspirators created, assisted in creating, and reviewed transactional documents and other materials containing false and fraudulent information, including false and fraudulent descriptions of the clients' motivations for entering into the HOMER financial transactions and for taking the various steps that would yield the tax benefits.

13.     The HOMER transaction included the following essential steps:

a.      The client would purchase from Bank B four so-called "barrier options," which were specialized foreign currency or bond options. The four options consisted of two "knock-out" options (which would become worthless, *i.e.*, "knock out," if a specified currency or bond exchange rate crossed a specified barrier), and two "knock-in" options (which would not become effective, *i.e.*, "knock in," unless a specified currency or bond exchange rate crossed a specified barrier). By design, two options would win (that is, be "in the money") and two would lose (that is, be "out of the money"). As its fee for implementing the HOMER financial transactions, Bank B would charge a premium of 1.25% of the desired tax loss, which represented Bank B's profit and the costs of implementing the options. Bank B would loan the client virtually all of the funds necessary to purchase the options, with the client providing the small balance. The loan posed no risk to Bank B, however, as the options and other collateral were required to be pledged at all times to fully secure the loan.

b.      After the options were purchased, they would be transferred to

6

a grantor retained trust that had been formed by J&G for the client to implement the HOMER

tax shelter. The client would then gift a small interest in the trust to a beneficiary of the

client's choosing (the "Unitrust Beneficiaries"), with the client retaining the remainder

interest. Because the client would retain the remainder interest, he would remain grantor of

the trust, the terms of which also provided that at a future point the client could reacquire

trust assets by substituting assets of equal value. The client would thereafter sell his

remainder interest to a purportedly unrelated third-party partnership owned by Individual A

and his wife, receiving in exchange a promissory note secured by the remainder interest. The

trust would then no longer be a grantor trust as to the client. Shortly after the sale of the

remainder interest, the client's power to substitute assets would spring into existence, thus

once again rendering the trust a grantor trust as to the client, and allowing the options' losses

to flow to the client.

        c.     On the so-called "observation date" specified in the options

contracts, Bank B would determine which two barrier options were the losers. The amount

to be paid under the winning options could not be determined until a later date, prior to which

the Unitrust Beneficiaries would have sold their interest in the trust to the purportedly

unrelated third-party partnership owned by Individual A, for an amount generally less than

$10,000. The third-party partnership would then be the sole beneficiary of the trust and be

the recipient of the proceeds of the winning options. Thus, the gains from the transaction

were left with Individual A, the third-party buyer.

7

d.     The trust would then be terminated and its major assets (that is, the winning options), would be distributed to Individual A's third-party partnership, and thereafter distributed to its partners, the corporations owned by Individual A and his wife, in liquidation of the third-party partnership. Individual A would use the proceeds of the settled options to pay off the promissory note to the client, who would then use the proceeds to repay the loan from Bank B for the initial options' purchase. The HOMER transaction was carefully constructed so that (1) the total premiums paid by the customer on the options were almost equivalent to the payout on the winning options, (2) neither Bank B, the client (except for the net premiums paid for the options), nor Individual A were at risk of meaningful loss at any stage of the transaction; and (3) each pair of barrier options was always transferred as a pair and the two barrier options within that pair were never transferred or assigned independently of one another.

14.     In recruiting Individual A to be the third-party buyer in the HOMER transaction, JOHN B. OHLE III, the defendant, advised Individual A that he had "hit the lottery" in being selected by OHLE to act as the third-party buyer. OHLE advised Individual A that OHLE would provide him with the approximate $375,000 necessary to fund the third-party partnership purchases of the Unitrust Beneficiaries' interests. OHLE further advised that Individual A would be required to split equally with OHLE any moneys earned by Individual A in acting as the third-party buyer, after OHLE was repaid the $375,000. On OHLE's instructions and with the assistance of J&G, Individual A established eight

8

partnerships — Waterford Financial Partners, Whittaker Financial Partners, Lexington Financial Partners, Leamington Financial Partners, Brighton Financial Partners, Essex Financial Partners, Gresham Financial Partners, and Leland Financial Partners — for use in the HOMER tax shelter. Individual A and his wife, also with the assistance of J&G, each formed a corporation, respectively named Waterford Capital Investors, Inc., and Gravier Financial Ltd., to act as the partners of the eight partnerships used in the HOMER transactions.

15.    J&G charged the HOMER clients (with one exception) 6% of the desired tax losses to be generated, of which J&G retained 2.6%. Taking into account the total fees, including the premium paid to Bank B, the client had no chance of earning a profit in excess of the fees charged. Indeed, there was only a very small chance that the client could earn more than Bank B's fees alone. Nor could the transaction be justified as a valid estate-planning tool, as the client would end up paying hundreds of thousands of dollars, or more, simply to give a $10,000 gift to a beneficiary.

16.    The law in effect at all times relevant to this Indictment provided that if a taxpayer claimed a tax benefit by using a tax shelter, and that benefit was later disallowed, the IRS could impose substantial penalties upon the taxpayer — ranging from 20% to 40% of the underpayment attributable to the shelter — unless the claimed tax benefit was supported by an independent opinion, reasonably relied upon by the taxpayer in good faith, that the tax benefit "more likely than not" would survive IRS challenge. Thus, in order

9

to encourage clients to participate in the HOMER transactions, with the agreement of JOHN B. OHLE III, the defendant, J&G provided a "more likely than not" opinion letter ("the opinion letter") to HOMER clients. However, OHLE and his co-conspirators, including J&G Lawyers A and B, knew the HOMER opinion letters were based on false and fraudulent statements, and omitted material facts. By helping clients obtain the false and fraudulent opinion letters, with the understanding and intent that they would be presented to the IRS in defense of the transaction, if and when the clients were audited, OHLE and his co-conspirators sought not only to undermine the ability of the IRS to ascertain the clients' true tax liabilities, but also to undermine the IRS's ability to determine whether penalties should be imposed.

17. The opinion letters contained the following false and fraudulent representations:

a. The opinion stated, "[T]he Trust was created for the purposes of effectuating a gift to the Unitrust Beneficiary and conserving and protecting the assets of the Trust for the benefit of the Trust's beneficiaries[;]" when, in truth and fact, the clients created the trust at the direction of J&G for the purpose of executing the HOMER tax shelter transaction, and not for genuine estate planning reasons.

b. The opinion stated, "You [the client] entered into the Options for substantial nontax business reasons, including (i) to produce overall economic profits because of your belief that the relevant bond prices would changes; and (ii) your belief that

the most direct way, with the most leverage, to realize gain from expected changes in currency prices was the Options." In truth and fact, the clients purchased the options — which were designed by the joint efforts of J&G lawyers and employees of Bank B pursuant to predetermined parameters and durations — in order to obtain the desired tax benefits, and thus the clients had no substantial nontax business reasons for entering into the options.

        c.      The opinion stated, "You [the client] entered into the Transactions, other than the creation of the Trust, for substantial nontax business reasons, including (without limitation) your belief that the potential economic benefits of owning the Note [the promissory note provided by the third-party buyer] outweighed the potential economic benefits of retaining the Remainder Interest, and a desire to maximize profits and minimize risks with respect to your various investment activities." In truth and fact, the clients sold the options to the third-party buyer because JOHN B. OHLE III, the defendant, and his co-conspirators advised the clients that such a sale was a necessary step to achieve the tax benefits. The clients were generally not provided with information about the financial health and credit-worthiness of the third-party buyer in order to be able to assess whether selling the Remainder Interest in exchange for the Note was an economically sound decision.

        d.      The opinion letter stated, "Neither you, the Trust, the Buyer, nor the Unitrust Beneficiary were obligated to engage in any transaction to which our opinion related upon the completion of any other of such transaction," when in truth and fact, JOHN B. OHLE III, the defendant, and his co-conspirators had marketed to Bank A and J&G's

11

clients, and the clients had paid fees to obtain, a strategy that, while not legally compelling a participant to complete any particular part of the transaction, consisted of a preplanned series of steps designed to result in the predetermined tax benefit, for which the client was paying large fees.

18. The HOMER transactions engaged in by J&G, Bank A, and Dumaine resulted in taxpayers claiming approximately $429,250,000 in false and fraudulent tax losses, resulting in the evasion of more than $103,000,000 in taxes. J&G earned approximately $12.1 million in fees on the HOMER transactions, while Bank A earned approximately $5.2 million.

## Statutory Allegations

19. From in or about 2001 until in or about 2004, in the Southern District of New York and elsewhere, JOHN B. OHLE III, the defendant, together with others known and unknown to the grand jury, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree to defraud the United States and an agency thereof, to wit, the IRS, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Sections 7201 and 7206(2).

## Objects of the Conspiracy

20. It was a part and object of the conspiracy that, from in or about 2001 until in or about 2004, JOHN B. OHLE III, the defendant, and others known and unknown to the grand jury, unlawfully, willfully, and knowingly would and did defraud the United

12

States of America and an agency thereof, to wit, the IRS, by impeding, impairing, defeating, and obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation, assessment, and collection of income taxes.

21.     It was a further part and object of the conspiracy that, from in or about late 2001 through in or about 2004, JOHN B. OHLE III, the defendant, and others known and unknown to the grand jury, unlawfully, willfully, and knowingly, would and did attempt to evade and defeat a substantial part of the income taxes due and owing by the HOMER clients, in violation of Title 26, United States Code, Section 7201.

22.     It was a further part and an object of the conspiracy that, from in or about late 2001 through in or about 2004, JOHN B. OHLE III, the defendant, and others known and unknown to the grand jury, unlawfully, willfully, and knowingly would and did aid and assist in, and procure, counsel, and advise the preparation and presentation under, and in connection with any matter arising under the internal revenue laws, of certain U.S. income tax returns for various years for 2001 and 2002, which were fraudulent and false as to material matters, in violation of Title 26, United States Code, Section 7206(2).

## Means and Methods of the Conspiracy

23.     Among the means and methods by which JOHN B. OHLE III, the defendant, and others known and unknown to the grand jury would and did carry out the objectives of the conspiracy were the following:

a.     They would and did design, market, and implement the HOMER

13

tax shelter transaction, and create false and fraudulent factual scenarios to support those transactions, so that wealthy individuals could pay a percentage of their income or gain in fees to J&G, Bank A, Bank B, and the other participants in the transactions, rather than paying a substantially greater amount in taxes to the IRS;

        b.     They would and did design, market, and implement the HOMER tax shelter transaction in ways that made it difficult for the IRS to detect it and determine the true nature of the transaction;

        c.     They would and did cause J&G to create eight different partnerships and two different corporations for use by Individual A to create the appearance that a number of unrelated third-party buyers were participating in the HOMER shelters;

        d.     They would and did design, market and implement the HOMER tax shelter transaction in ways that disguised the fact that the HOMER tax shelter transaction was tax-motivated, and lacked a substantial nontax business purpose;

        e.     They would and did seek to prevent the IRS from learning that they had marketed a strategy consisting of preplanned steps leading to predetermined tax benefits;

        f.     They would and did prepare and assist in preparing, and cause to be prepared, false and fraudulent documents in order to deceive the IRS, including but not limited to, transactional documents and correspondence;

        g.     They would and did assist in crafting legal opinions for use by

14

HOMER clients in defending the transactions and shielding the clients from penalties, knowing that these opinions contained false, fraudulent, and misleading information and omitted other information, all of which was material to a determination of whether the claimed tax results were allowable; and

   h.  They would and did cause to be prepared tax returns for the HOMER clients that were false and fraudulent because, among other things, they claimed fraudulent tax losses and thereby substantially understated the tax due and owing by the HOMER clients.

**Overt Acts**

   24.  In furtherance of the conspiracy and to effect the illegal objects thereof, JOHN B. OHLE III, the defendant, and his co-conspirators, committed and caused to be committed the following overt acts, among others, in the Southern District of New York and elsewhere:

   a.  On or about May 16, 2001, J&G Lawyer B sent an email to a co-conspirator not named as a defendant herein, Broker A for Bank B, in which Lawyer B stated:

> Here's the summary for the HOMER deal we discussed. Also, I attached a chart showing the terms I had in mind for the two kinds of options we talked about earlier. I'll look at the stuff you forwarded from [a trader at Bank B], and see if that changes anything. It sounds pretty similar. Let's talk about [the trader at Bank B]'s options.

   b.  On or about May 21, 2001, Lawyer B sent an email to a second

15

trader on Bank B's foreign currency exchange desk in Manhattan, New York, with whom he

was discussing various proposed financial instruments to be used in the HOMER transaction,

in which Lawyer B stated:

> There's a bit of a problem with your recent suggestion. We'd thought about
> doing the options with one long and one short, but it raises a handful of tax
> issues we'd just as soon avoid. The options will likely be moved around a bit.
> The Tax treatment of the various entities involved is such that both options
> need to be purchased by the client, which is why discussion last week related
> to purchasing two options, and borrowing the premium amount.

> Also, to the extent possible, we would prefer the payouts to be fixed in amount
> for various possibile [sic] market states, rather than using payouts which
> fluctuate with the markets. This permits easier explanation of the trade, as the
> number of possible outcomes is so small, and also seems to make people more
> comfortable because there is a maximum amount of value at risk. I do,
> however, think that the principal is sound.

      c.      In or about May 2001, JOHN B. OHLE III, the defendant, and

Lawyer A instructed a member of Bank A's ISG about the HOMER transaction in order for

the member to be able to pitch the transaction to her clients.

      d.      In or about mid 2001, Lawyers A and B drafted and assisted in

drafting a legal opinion for the HOMER transaction.

      e.      In or about September 2001, JOHN B. OHLE III, the defendant,

Lawyer A, and Individual A met in Chicago to discuss Individual A's role as the third-party

buyer in the HOMER transaction.

      f.      On or about October 2, 2001, Lawyer A participated in a

telephone conference call with representatives of Bank B in Manhattan, New York, regarding

J&G's intent and willingness to provide a "more likely than not" legal opinion on the HOMER transaction.

g.    In or about October 2001, JOHN B. OHLE III, the defendant, and other members of ISG met with a client at Bank A's office in Chicago to pitch the HOMER transaction.

h.    On or about November 2, 2001, JOHN B. OHLE III, the defendant, caused three Louisiana-based businessmen who were acquaintances to enter into HOMER tax shelter transactions in which each of the three acquaintances made another of the three the Unitrust Beneficiary of their respective trusts, thus effectively gifting money to each other in a circular transfer of funds.

i.    On or about November 14, 2001, JOHN B. OHLE III caused J&G to establish Individual A's eight different partnerships for use as the third-party buyers in the HOMER transactions.

j.    On or about November 30, 2001, Lawyer A sent a confidentiality agreement to Individual A, requiring his signature, which affirmed that Individual A would use "confidential proprietary information" involving "certain financing structures [] developed by J&G and/or its clients, consultants or co-counsel, that provide economic, financial, business and tax advantages for individual and companies through the use of the Structures" only to evaluate the Structures and a potential relationship with J&G.

17

k.      On or about December 4, 2001, JOHN B. OHLE III, the defendant, caused a $125,000 wire transfer to be sent to the personal checking account of Individual A to partially fund Individual A's role as the third-party buyer in the HOMER transaction.

l.      On or about December 10, 2001, JOHN B. OHLE III, the defendant, caused a $250,000 wire transfer to be sent to the personal checking account of Individual A to partially fund Individual A's role as the third-party buyer in the HOMER transaction.

m.      On or about December 9, 2002, a HOMER client signed and filed with the IRS a false and fraudulent U.S. Individual Income Tax Return that reported approximately $4,004,000 in ordinary losses and approximately $7,992,000 in capital losses stemming from the execution of a HOMER transaction.

n.      On or about June 4, 2003, J&G sent a HOMER client a "more likely than not" opinion letter for a HOMER transaction.

(Title 18, United States Code, Section 371.)

18

**COUNT TWO**

(Tax Evasion: HOMER Client D.W. – Defendant JOHN B. OHLE III )

The Grand Jury further charges:

25.     Paragraphs 1-18, 23, and 24 of this indictment are realleged and incorporated by reference as though fully set forth herein.

26.     Among the Bank A clients who participated in a HOMER tax shelter was D.W., who, at all times relevant to the Indictment, owned a firm that specialized in exchange traded options in Chicago, Illinois.

27.     In or about October 2001, D.W. was introduced to JOHN B. OHLE III, the defendant, through a mutual acquaintance. D.W. met with OHLE and other ISG members in Chicago and was presented with a tax elimination strategy D.W. later came to know as the HOMER transaction. OHLE and the other ISG members described the strategy as one that they had invented and that was secret and proprietary. In response to specific inquiries by OHLE and others about the nature of D.W.'s income during the 2001 tax year, D.W. advised that it consisted of long-term and short-term capital gains. The ISG representatives also advised that J&G would provide a legal opinion on the transaction.

28.     Subsequently, D.W. met twice with Lawyer A and another lawyer from J&G. JOHN B. OHLE, the defendant, and other ISG personnel were present at the second meeting. During the first meeting, Lawyer A provided D.W. with and reviewed an "Executive Summary" that outlined the steps of the HOMER transaction. D.W. understood that in order to achieve the desired tax benefits, the steps would have to be executed in the

19

proper order. During one of these meetings, the fees were described to D.W. as a percentage of the income or gain to be sheltered.

29.     Based on conversations with Bank A and J&G personnel, D.W. understood that the HOMER transaction would include four options on a German bond: a knock-in call option, a knock-out put option, a knock-in put option, and a knock-out call option. Despite his experience as an options trader, D.W. had no experience in trading the type of options used in the HOMER transaction. J&G personnel chose the German bond as the options investment for D.W.'s HOMER transaction. Neither ISG personnel, including JOHN B. OHLE III, the defendant, nor the J&G personal discussed the probabilities or expected value for the options in D.W.'s HOMER transaction, although it was conveyed to D.W. that he could make some money on the options. However, D.W. knew at the time he entered into the HOMER transaction that the expected value of the options was negative. D.W. understood that, notwithstanding the outcome of the financial bet on the options, he would receive the tax benefits generated by the HOMER transaction.

30.     D.W. understood from his meetings with JOHN B. OHLE III, the defendant, Lawyer A, and the others that, in order to generate a tax loss of approximately $69,000,000, the cash collateral required to purchase the options from Bank B would be approximately $1 million, and that the fees to J&G would be approximately $3 million. D.W. asked OHLE whether those should be taken into account relative to the economics of the overall transaction. In response, OHLE told him that he should not consider the fees paid

20

to J&G because of the "donative intent" of the grantor trust. However, D.W. did not personally have a donative intent relative to his transaction. Instead, D.W. carried out the gifting step of the transaction because it was required in order to obtain the tax benefit. D.W. gifted the unitrust beneficial interest, which was ultimately worth $9,941, to his business partner's adopted child as part of D.W.'s HOMER transaction.

31.     On or about November 20, 2001, J&G arranged for D.W. to acquire two pairs of German bond options. The loan from Bank B to D.W. to purchase the options totaled approximately $137,137, 500, and was collateralized by the options. The cost to D.W. of the two option pairs (the "net premium") was approximately $862,500. The fees to J&G were $1,794,000 and the fees to Bank A were approximately $1,242,000. Given these fees and the structure of the HOMER options, D.W. had no realistic possibility to make a profit on the HOMER transaction.

32.     On or about November 26, 2001, D.W.'s option pairs were transferred to the grantor trust in accordance with the preplanned series of steps constituting the HOMER transaction, and the gift made to the Unitrust Beneficiary. On or about December 7, 2001, D.W. sold his remainder interest in the trust to Whittaker Financial Partners, one of Individual A's partnerships, receiving in return a promissory note with a principal amount of $137,287,536. D.W. was never advised that Individual A was a friend of JOHN B. OHLE III, the defendant, who funded Individual A's participation in the HOMER transaction.

33.     On or about December 10, 2001, pursuant to the terms of the Trust

Agreement, D.W.'s power of substitution of assets sprang into existence, thereby rendering the trust as grantor trust as to D.W. again.

34.    On or about December 13, 2001, on the options' observation date, two of the four options expired worthless, producing the purported tax loss that flowed to the client.

35.    On or about December 14, 2001, Whittaker Financial Partners, the entity owned by Individual A, acquired the Unitrust Interest from the Unitrust Beneficiary for approximately $9,941.  Thereafter, the trust terminated and the trust assets consisting of the remaining two options and cash were distributed to Whittaker Financial Partners.

36.    On or about December 17, 2001, Whittaker Financial Partners was liquidated, the note was assumed by Whittaker Financial Partner's partners (Waterford Capital Investors and Gravier Financial Ltd.), and Whittaker's assets were distributed to the partners.

37.    On or about December 19, 2001, the winning options — now held by Waterford Capital Investors and Gravier Financial Ltd. — expired.  On or about December 21, 2001, they paid $137,396,985.13 to D.W. in payment of the promissory note for the purchase of the remainder interest.  On or about December 21, 2001, D.W. repaid Bank B $137,356,158.13 for the loan to purchase the options initially.

38.    On or about October 17, 2001, D.W. filed a U.S. Individual Income Tax Return, Form 1040, for calendar year 2001, which claimed the false and fraudulent HOMER

losses, thereby resulting in a substantial understatement of D.W.'s taxable income and tax due and owing.

39.    In exchange for the $1,794,000 fee, J&G issued a legal opinion that included representations purportedly made by D.W., but which in fact were not made by D.W. (or anyone acting on D.W.'s behalf) and were, in truth and fact, false and misleading.

## Statutory Allegations

40.    From in or about October 2001 through at least on or about October 17, 2002, in the Southern District of New York and elsewhere, JOHN B. OHLE III, the defendant, unlawfully, willfully, and knowingly did attempt to evade and defeat a substantial part of the income tax due and owing by D.W. to the United States of America for calendar year 2001 by various means, including among others, (a) designing and implementing a HOMER transaction that he knew had no reasonable possibility of generating a profit; (b) using the HOMER transaction to generate approximately $69,000,000 in false and fraudulent tax losses he knew could not properly be deducted on D.W.'s returns; (c) creating a trust entity that served no legitimate trust purpose, but was used merely to obtain tax benefits; and (d) preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed by D.W., a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for calendar year 2001, which was filed with the IRS on or about October 17, 2002, which substantially understated D.W.'s taxable income and tax due and owing.

(Title 26, United States Code, Section 7201, and
Title 18, United States Code, Section 2)

23

**COUNT THREE**

(Tax Evasion: HOMER Client C.P. – Defendant JOHN B. OHLE III)

The Grand Jury further charges:

41.    Paragraphs 1-18, 23, and 24 of this indictment are realleged and incorporated by reference as though fully set forth herein.

42.    Among the Bank A clients who participated in a HOMER tax shelter was C.P., who, at all times relevant to the Indictment, was a resident of McComb, Mississippi, and the owner of several businesses, including truck stops.

43.    In or about October 2001, C.P. was introduced to JOHN B. OHLE III, the defendant, through C.P.'s banker at Bank A. On or about October 8, 2001, C.P., together with certain employees and advisors, met with OHLE and other ISG members in New Orleans and was presented with the HOMER strategy as a means to eliminate the taxes C.P. expected to owe as a result of the sale of several truck stops. OHLE explained that the fees were based on a percentage of the tax loss expected to be generated, and that Bank A and J&G would be paid out of these fees. OHLE also advised C.P. that J&G would provide a legal opinion on the transaction, which he understood would provide him with protection if the IRS identified the transaction.

44.    Notwithstanding the fact that C.P. had preexisting trusts available for providing gifts to his estate-planning beneficiaries, JOHN B. OHLE III, the defendant, and J&G required him to establish a new trust for the purpose of executing the HOMER transaction. C.P.'s employee was named the Unitrust Beneficiary, and was ultimately gifted

24

$19,875 in the HOMER transaction.

45.     On or about November 19, 2001, J&G arranged for C.P. to acquire two pairs of Euro/U.S. dollar currency options and two pairs of German bond options. The loan from Bank B to C.P. to purchase the options totaled approximately $23,850,000, and was collateralized by the options. The cost to C.P. of the options (the "net premium") was approximately $150,000. The fees to J&G were approximately $312,000. The fees to Bank A were approximately $156,000. JOHN B. OHLE III, the defendant, also caused $60,000 to be paid to C.P.'s attorney as a referral fee. Given these fees and the structure of the HOMER options, C.P. had no realistic possibility to make a profit on his HOMER transaction.

46.     On or about November 21, 2001, C.P.'s option pairs were transferred to the grantor trust in accordance with the preplanned series of steps constituting the HOMER transaction, and the $19,875 gift made to the Unitrust Beneficiary. On or about December 7, 2001, C.P. sold his remainder interest in the trust to Gresham Financial Partners, one of Individual A's partnerships, receiving in return a promissory note with a principal amount of $23,871,713. C.P. was never advised that Individual A was a friend of JOHN B. OHLE III, the defendant, who funded Individual A's participation in the HOMER transaction.

47.     On or about December 10, 2001, pursuant to the terms of the Trust Agreement, C.P.'s power of substitution of assets sprang into existence.

25

48.     On or about December 13, 2001, on the options' observation date, two of the four options' pairs expired worthless, producing the purported tax loss that flowed to the client.

49.     On or about December 14, 2001, Gresham Financial Partners acquired the Unitrust Interest from the Unitrust Beneficiary for $19,875.22. Thereafter, the trust terminated and the trust assets consisting of 'the remaining two options and cash were distributed to Gresham Financial Partners.

50.     On or about December 17, 2001, Gresham Financial Partners was liquidated, the note was assumed by Gresham Financial Partner's partners (Waterford Capital Investors and Gravier Financial Ltd.), and Gresham's assets were distributed to the partners.

51.     On or about December 19, 2001, the winning options – now held by Waterford Capital Investors and Gravier Financial Ltd. – expired. On or about December 21, 2001, they paid $23,890,743.75 to C.P. in payment of the promissory note for the purchase of the remainder interest. On or about December 21, 2001, C.P. repaid Bank B $23,890,743.75 for the loan to purchase the options initially.

52.     On or about December 9, 2002, C.P. filed a U.S. Individual Income Tax Return, Form 1040, for calendar year 2001, which claimed the false and fraudulent HOMER losses, thereby resulting in a substantial understatement of C.P.'s taxable income and tax due and owing.

53.     In exchange for the $312,000 fee, J&G issued a legal opinion that

included representations purportedly made by C.P., but which in fact were not made by C.P. (or anyone acting on C.P.'s behalf) and were, in truth and fact, false and misleading.

54. At no time did C.P. understand the HOMER strategy or the options used in his HOMER transaction. He had little experience in stock market investments, and none with derivatives or options prior to the implementation of the HOMER transaction.

### Statutory Allegations

55. From in or about October 2001 through at least on or about December 9, 2002, in the Southern District of New York and elsewhere, JOHN B. OHLE III, the defendant, unlawfully, willfully, and knowingly did attempt to evade and defeat a substantial part of the income tax due and owing by C.P. to the United States of America for calendar year 2001 by various means, including among others, (a) designing and implementing a HOMER transaction that he knew had no reasonable possibility of generating a profit; (b) using the HOMER transaction to generate approximately $11,996,000 in false and fraudulent tax losses he knew could not properly be deducted on C.P.'s return; (c) creating a trust entity that served no legitimate trust purpose, but was used merely to obtain tax benefits; and (d) preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed by C.P., a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for calendar year 2001, which was filed with the IRS on or about December 9, 2002, which substantially understated C.P.'s taxable income and tax due and owing.

(Title 26, United States Code, Section 7201, and
Title 18, United States Code, Section 2)

27

## COUNT FOUR
### (Tax Evasion: HOMER Client D.D. – Defendant JOHN B. OHLE III)

The Grand Jury further charges:

56. Paragraphs 1-18, 23, and 24 of this indictment are realleged and incorporated by reference as though fully set forth herein.

57. Among the individuals who participated in a HOMER tax shelter was D.D., who, at all times relevant to the Indictment, was the co-owner, together with certain family members, of several businesses in New Orleans, Louisiana, and elsewhere, including real estate partnerships and parking lots.

58. In or about the early fall of 2001, D.D. received a cold call from JOHN B. OHLE III, the defendant, who told D.D. that he had a tax planning mechanism that he would like to discuss with D.D. Shortly thereafter, D.D. met with OHLE in D.D.'s office in New Orleans, Louisiana. OHLE described the HOMER transaction to D.D. as a novel and "bulletproof" structure that was proprietary to Bank A and J&G.

59. In or about October 2001, D.D. again met with JOHN B. OHLE III, the defendant, along with, among others, another ISG member and D.D.'s Chief Financial Officer. As a result of the two meetings with OHLE, D.D. understood that the HOMER strategy would act to eliminate taxes due by D.D. and other members of his family as a result of the sale of several businesses in 2001. D.D. further understood that the size of the fees to enter the HOMER transaction were tied to the amount of the tax savings created, the amount of which D.D. could choose.

28

60.     Based on his discussions with JOHN B. OHLE III the defendant, and Bank B, D.D. understood that there was no real potential to make money on the options transactions effectuated by Bank B as part of D.D.'s HOMER transaction. D.D. further understood that the HOMER transaction made economic sense only if the tax benefits were considered. D.D. understood that his economic risk was limited to the out-of-pocket costs to enter the HOMER transaction. OHLE provided D.D. a worst case scenario in which, even if the IRS disallowed the transaction, it would likely settle for a percentage of the taxes due.

61.     In or about November 2001, D.D. was made aware of the need to sign a form of guaranty in connection with the loan from Bank B to purchase the options used in implementing the HOMER transaction. D.D. spoke with Broker A at Bank B about D.D.'s concerns about signing a guaranty with respect to a transaction he did not fully understand. Broker A advised D.D. that his risk with respect to the guaranty was immaterial. D.D. was also assured by OHLE and others at Bank A that the guaranty was something about which he should not be financially concerned.

62.     D.D. understood that J&G would provide an opinion letter for the HOMER transaction that could be shown to the IRS as a "line of defense" if the HOMER transaction was challenged by the IRS.

63.     On or about November 29, 2001, J&G arranged for D.D. to acquire two pairs of German bond options. The loan from Bank B to D.D. to purchase the options totaled approximately $11,925,000, and was collateralized by the options. The cost to D.D. of the

29

two option pairs (the "net premium") was approximately $75,000. The fees to J&G were approximately $156,000. The fees to Bank A were approximately $76,500. JOHN B. OHLE III, the defendant, also caused additional amounts to be paid to D.D.'s attorney and to the BRADLEY law firm as referral fees. Given these fees and the structure of the HOMER options, D.D. had no realistic possibility to make a profit on the HOMER transaction.

64.     On or about December 4, 2001, D.D.'s option pairs were transferred to the grantor trust in accordance with the preplanned series of steps constituting the HOMER transaction, and the gift made to the Unitrust Beneficiary. On or about December 7, 2001, D.D. sold his remainder interest in the trust to Brighton Financial Partners, one of Individual A's partnerships, receiving in return a promissory note with a principal amount of $11,927,714. D.D. was never advised that Individual A was a friend of OHLE, who had funded Individual A's participation in the HOMER transaction.

65.     On or about December 10, 2001, pursuant to the terms of the Trust Agreement, D.D.'s power of substitution of assets sprang into existence.

66.     On or about December 13, 2001, on the options' observation date, two of the four options expired worthless, producing the purported tax loss that flowed to the client.

67.     On or about December 14, 2001, Brighton Financial Partners acquired the Unitrust Interest from the Unitrust Beneficiary for approximately $4,969. Thereafter, the trust terminated and the trust assets consisting of the remaining two options and cash were

distributed to Brighton Financial Partners.

68.     On or about December 17, 2001, Brighton Financial Partners was liquidated, the note was assumed by Brighton Financial Partner's partners (Waterford Capital Investors and Gravier Financial Ltd.), and Brighton's assets were distributed to the partners.

69.     On or about December 19, 2001, the winning options — now held by Waterford Capital Investors and Gravier Financial Ltd. — expired. On or about December 21, 2001, they paid $11,937,223.13 to D.D. in payment of the promissory note for the purchase of the remainder interest. On or about December 21, 2001, D.D. repaid Bank B $11,937,223.13 for the loan to purchase the options initially.

70.     On or about October 21, 2002, D.D. filed a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for calendar year 2001, which claimed the false and fraudulent HOMER losses, thereby resulting in a substantial understatement of D.D.'s taxable income and tax due and owing.

71.     In exchange for the $156,000 fee, J&G issued a legal opinion that included representations purportedly made by D.D., but which in fact were not made by D.D. (or anyone acting on D.D.'s behalf) and were, in truth and fact, false and misleading.

### Statutory Allegations

72.     From in or about October 2001 through at least on or about October 21, 2002, in the Southern District of New York and elsewhere, JOHN B. OHLE III, the defendant, unlawfully, willfully, and knowingly did attempt to evade and defeat a substantial

part of the income tax due and owing by D.D. to the United States of America for calendar year 2001 by various means, including among others, (a) designing and implementing a HOMER transaction that he knew had no reasonable possibility of generating a profit; (b) using the HOMER transaction to generate approximately $5,944,000 in false and fraudulent tax losses he knew could not properly be deducted on D.D.'s return; (c) creating a trust entity that served no legitimate trust purpose, but was used merely to obtain tax benefits; and (d) preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed, a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for calendar year 2001, which was filed with the IRS on or about October 21, 2002, which substantially understated D.D.'s taxable income and tax due and owing.

(Title 26, United States Code, Section 7201, and
Title 18, United States Code, Section 2)

**COUNT FIVE**
(The Referral Fee Fraud and Personal Income Tax Fraud Conspiracy
– Defendants JOHN B. OHLE III and WILLIAM BRADLEY)

The Grand Jury further charges:

73.    Paragraphs 1-18 of this indictment are realleged and incorporated by reference as though fully set forth herein.

**Introduction**

74.    JOHN B. OHLE III and WILLIAM BRADLEY, the defendants, and others known and unknown to the grand jury, engaged in a scheme to unlawfully obtain the

32

payment of referral fees in several HOMER transactions by submitting and causing to be submitted false and fraudulent invoices to J&G for payment, to unlawfully obtain funds from an OHLE client, a portion of which were used to fund Individual A's participation as the third-party buyer in the HOMER transactions, and subsequently failing to accurately report and pay taxes on the ill-gotten fees and other income. As a result, OHLE willfully evaded taxes on at least $642,634 in income in 2001 and at least $1,439,406 in income in 2002.

### Background

75.     At all times relevant to the Indictment, defendant WILLIAM E. BRADLEY was an attorney in private practice in Hammond, Louisiana, doing business as a sole practitioner under the name "Bradley Law Firm LLC." BRADLEY, whose primary practice area was personal injury law, became acquainted with defendant JOHN B. OHLE III during their preparation for the Louisiana bar examination.

76.     Douglas Steger, a co-conspirator not named as a defendant herein, was a resident of Northfield, Illinois. From approximately 1989 until approximately late 2001, Douglas Steger owned and operated American Financial Capital Corporation ("AmCap"), which was engaged in the business of raising money for hedge funds, including a Bermuda-based hedge fund with an office in Manhattan, New York ("Carpe Diem"). AmCap maintained a bank account at North Shore Community Bank, Wilmette, Illinois.

77.     Individual B was an investment advisor who resided, at certain times relevant to this Indictment, in San Francisco, California. Individual B became acquainted

33

with JOHN B. OHLE III, the defendant, when both worked in New Orleans, Louisiana. In late 2001, Individual B worked as an investment advisor, providing investment consulting services to clients.

78.     Individual C was a business associate of JOHN B. OHLE III, the defendant. Individual C became acquainted with OHLE while both worked at Bank A. Individual C was the owner of JDC Group, Inc. In or about February 2002, Individual C became a partner in Dumaine.

79.     As part of their efforts to market, sell, and implement HOMER transactions, JOHN B. OHLE III, the defendant, other members of Bank A's ISG, and attorneys at J&G agreed to pay referral fees to third parties who referred a client who ultimately entered into a HOMER transaction. Generally, the referral fees were paid after the third-party referral sources sent invoices to J&G, leading it to pay the fees to the third parties based on the amounts stated in the invoices. J&G would also issue to the third parties, where appropriate, IRS Forms 1099-MISC, reflecting the payment of the referral fees as non-employee compensation to the third parties. When a referral fee was paid in connection with a particular HOMER transaction, it served to reduce the total fee that Bank A would otherwise be paid in that transaction. Pursuant to Bank A's code of conduct for employees and the duty of honest services owed by ISG members to Bank A, ISG members were not permitted to receive or accept referral or third-party fees, either directly or indirectly, in connection with the sale and implementation of the HOMER tax shelter transactions or any

34

other ISG transaction.

### Statutory Allegations

80.     From in or about late 2001 until at least on or about February 15, 2004,

in the Southern District of New York and elsewhere, JOHN B. OHLE III, and WILLIAM

BRADLEY, the defendants, together with Douglas Steger, a co-conspirator not named as a

defendant herein, and others known and unknown, unlawfully, willfully, and knowingly did

combine, conspire, confederate, and agree together and with others to defraud the United

States and an agency thereof, to wit, the IRS of the United States Department of Treasury,

and to commit offenses against the United States, to wit, violations of Title 18, United States

Code, Sections 1343 and 1346, and Title 26, United States Code, Sections 7201, 7206(1), and

7206(2).

### Objects of the Conspiracy

81.     It was a part and object of the conspiracy that, from in or about late 2001

through in or about 2004, JOHN B. OHLE III, and WILLIAM BRADLEY, the defendants,

and others, unlawfully, willfully, and knowingly would and did defraud the United States of

America and an agency thereof, to wit, the IRS, by impeding, impairing, defeating, and

obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation,

assessment, and collection of income taxes owed by OHLE, BRADLEY, and others, as a

result of their unlawful receipt of referral fee and other income.

82.     It was a further part and object of the conspiracy that, from in or about

35

late 2001 through in or about 2004, JOHN B. OHLE III, and WILLIAM BRADLEY, the defendants, together with others, unlawfully, knowingly, and intentionally having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and a scheme to defraud Bank A and its shareholders of their intangible right to the honest services of OHLE, to wit, the creation and submission of false and fraudulent invoices to the J&G law firm for payment of third-party referral fees to which the purported service providers listed on the invoices were not entitled, in order that J&G would pay said referral fees to the unlawful financial benefit of OHLE and BRADLEY, and for the purpose of executing such scheme and artifice and attempting so to do, would and did transmit and cause to be transmitted by means of wire and radio communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit, interstate telephone calls, faxes, and e-mails, in violation of Title 18, United States Code, Sections 1343 and 1346.

83.    It was a further part and object of the conspiracy that, from in or about 2001 through in or about 2003, JOHN B. OHLE III, and WILLIAM BRADLEY, the defendants, and others, unlawfully, willfully, and knowingly, would and did attempt to evade and defeat a substantial part of the income taxes due and owing by defendant JOHN B. OHLE III, in violation of Title 26, United States Code, Section 7201.

84.    It was a further part and object of the conspiracy that, from in or about late 2001 through in or about 2004, JOHN B. OHLE III, the defendant, and others,

unlawfully, willfully, and knowingly, would and did make and subscribe U. S. Individual

Income Tax Returns, which returns contained and were verified by written declarations that

they were made under the penalties of perjury and which OHLE and the others did not

believe to be true and correct as to every material matter, to wit, OHLE and his co-

conspirators subscribed and caused to be subscribed, and thereafter filed and caused to be

filed with the IRS, individual income tax returns that failed properly to report fee and other

income received by the conspirators, in violation of Title 26, United States Code, Section

7206(l).

85.    It was a further part and an object of the conspiracy that, from in or

about late 2001 through in or about 2004, JOHN B. OHLE III, the defendant, and others,

unlawfully, willfully, and knowingly would and did aid and assist in, and procure, counsel,

and advise the preparation and presentation under, and in connection with any matter arising

under the internal revenue laws, of certain U.S. income tax returns for various years from

2001 through 2003, which were fraudulent and false as to material matters, in violation of

Title 26, United States Code, Section 7206(2).

### Means and Methods of the Conspiracy

86.    Among the means and methods used by JOHN B. OHLE III, and

WILLIAM BRADLEY, the defendants, and their co-conspirators, to achieve the objects of

the conspiracy were the following:

I.     **THE FALSE AND FRAUDULENT HOMER REFERRAL FEE INVOICES**

       A.     <u>**The False and Fraudulent HOMER Referral Fee Invoices Related to Douglas Steger**</u>

            a.     In or about December 2001, JOHN B. OHLE III, the defendant, contacted Douglas Steger and suggested that Steger prepare and submit to J&G two false and fraudulent invoices, seeking payment from J&G for referral fees related to two HOMER clients ("Client A" and "Client B," respectively) for whom referral fees would not otherwise have been paid by Bank A. Despite the fact that he did not refer either Client A or Client B to Bank A and was not otherwise entitled to referral fees in connection with those clients, Steger agreed to send the fraudulent invoices. Accordingly, pursuant to instructions provided by OHLE and unbeknownst to the two HOMER clients, Steger prepared and sent to J&G in Chicago two invoices — for $50,000 and $31,500, totaling $81,500 — that falsely and fraudulently represented that Steger was entitled to referral fees in connection with Client A and Client B's HOMER tax shelter transactions. Consequently, J&G paid the invoices with two wire transfers for $50,000 and $31,500, to Steger's AmCap bank account. Steger thereafter transferred $81,500 to OHLE via a cashier's check, which was deposited in OHLE's personal bank account at Hibernia National Bank, New Orleans, Louisiana.

            b.     On or about December 24, 2001, OHLE caused two invoices to be sent to J&G seeking $920,000 in referral fees for the purported referral to Bank A of two HOMER clients, Clients C and D. The invoices, sent on the purported letterhead of a

business owned by Individual B, were in the respective amounts of $630,000 and $290,000.

   c. On or about December 28, 2001, J&G paid the invoices via a $920,000 wire transfer to Individual B's business bank account in San Francisco, California.

   d. In or about early 2002, OHLE enlisted Douglas Steger to arrange for and receive a transfer of the $920,000 being held by Individual B.  Towards that end, OHLE caused Steger to hire an attorney to contact Individual B to arrange the transfer of the $920,000 to Steger's AmCap bank account, which occurred on or about January 15, 2002. In truth and fact, neither OHLE, Steger, nor Individual B or his business was entitled to any referral fees in connection with the HOMER transactions of Client C or Client D.  In addition, OHLE instructed Steger to make false and fraudulent statements about the receipt and nature of the referral fees if asked about them.

   e. In or about early 2002, on the instructions of OHLE, Douglas Steger disbursed the majority of the $920,000 in proceeds to OHLE, and to others specified by OHLE, in a manner designed to conceal OHLE's receipt of the referral fee income.

   f. On or about October 15, 2003, OHLE filed with the IRS a U.S. Individual Income Tax Return, Form 1040, for the tax year 2002, which tax return (i) falsely and fraudulently omitted income totaling at least $1,439,406, including more than $700,000 of OHLE's share of the ill-gotten referral fee income; and (ii) falsely claimed losses from a fraudulent tax shelter transaction, which falsities caused OHLE to substantially understate his taxable income and tax due and owing for the 2002 tax year.

g.     On or about October 15, 2003, OHLE caused a lawyer at a law firm in New York, New York, to issue a false and fraudulent opinion letter on the transaction used by OHLE to eliminate taxes due and owing on his 2002 U.S. Individual Income Tax Return.

h.     In or about February 2004, Douglas Steger, on the instructions and with the assistance of OHLE, filed a joint U.S. Individual Income Tax Return, Form 1040, for the tax year 2002, on which Steger falsely and fraudulently over-reported his income by including, as his income, the full amount of the $920,000 in proceeds received from Individual B, notwithstanding the fact that Steger was a conduit for OHLE, who ultimately received over $700,000 of those proceeds, with Steger keeping the remainder for his own benefit. Further, on the instructions and with the assistance of OHLE, Steger employed a tax shelter transaction on his 2002 individual tax return to create false and fraudulent losses to offset the $920,000 in referral fees that Steger reported on his 2002 tax return. OHLE showed his opinion letter to Steger, who did not obtain an opinion letter for his own tax shelter transaction.

**B.     The False and Fraudulent HOMER Referral Fee Invoices Related to Defendant WILLIAM BRADLEY**

87.     In or about December 2001, JOHN B. OHLE III, the defendant, contacted WILLIAM BRADLEY, the defendant, and requested that BRADLEY prepare and submit to J&G three invoices from the Bradley Law Firm for a group of family members ("Client Group 1") from the New Orleans area who were persuaded to participate in HOMER

transactions by OHLE, among others.

88.    The three invoices sought payment from J&G for services purportedly rendered by WILLIAM BRADLEY, the defendant, in connection with the HOMER transaction entered into by Client Group 1. Despite the fact that he performed no services and was not otherwise entitled to referral fees in connection with Client Group 1's HOMER transaction or any other HOMER transaction, BRADLEY agreed to send the invoices. Accordingly, pursuant to instructions provided by JOHN B. OHLE III, the defendant, and unbeknownst to Client Group 1, BRADLEY prepared three invoices — in the respective amounts of $32,625, $15,750, and $64,125, totaling $112,500 — that falsely and fraudulently represented that BRADLEY had rendered services for Client Group 1 in connection with its HOMER tax shelter transactions. On or about December 26, 2001, BRADLEY faxed the three invoices, reciting purported "services rendered," from his office in Hammond, Louisiana, to J&G in Chicago, Illinois.

89.    Also on or about December 26, 2001, WILLIAM BRADLEY, the defendant, faxed two additional false and fraudulent invoices from Hammond, Louisiana to J&G in Chicago for services purportedly done by BRADLEY for two additional HOMER clients of Bank A ("Client Group 2"). Unbeknownst to Client Group 2, BRADLEY had prepared the two invoices — for $85,000 and $57,500, totaling $142,500 — that falsely and fraudulently represented that BRADLEY had rendered services for Client Group 2 in connection with its HOMER tax shelter transactions. In truth and fact, BRADLEY had

41

rendered no services to Client Group 2 in connection with their HOMER transactions and was not otherwise entitled to referral fees on those transactions.

90.     On or about December 28, 2001, in payment of the five false and fraudulent invoices sent by WILLIAM BRADLEY, the defendant, J&G caused a $255,000 wire transfer to be sent from J&G's bank account in Texas to BRADLEY's client trust fund account, at Hancock Bank, Hammond, Louisiana.

91.     On or about December 28, 2001, WILLIAM BRADLEY, the defendant, issued from his client trust fund account a check payable to himself in the amount of $5,000, as part of his share of the $255,000 obtained by fraud.

92.     On or about January 2, 2002, WILLIAM BRADLEY, the defendant, issued from his client trust fund account two additional checks payable to himself totaling $20,000, as part of his share of the $255,000 obtained by fraud.

93.     On or about January 4, 2002, on the instructions of JOHN B. OHLE III, the defendant, WILLIAM BRADLEY, the defendant, sent a wire transfer in the amount of $46,000 from his client trust fund account to OHLE's bank account, as his share of the $255,000 obtained by fraud. OHLE subsequently failed to report this payment to the IRS or his employer, Bank A.

94.     On or about January 8, 2002, on the instructions of JOHN B. OHLE III, the defendant, WILLIAM BRADLEY, the defendant, issued a $184,000 check from his client trust fund account to JDC Group, Inc., an entity owned and controlled by Individual

42

C, who was due a referral fee stemming from Client C's HOMER transaction. Thereafter, on or about December 18, 2002, at OHLE's insistence that Individual C "take care of" BRADLEY, Individual C gave a $4,000 check to BRADLEY.

95.     In or about early 2002, as a result of the $255,000 payment by J&G based on the five false and fraudulent invoices submitted by WILLIAM BRADLEY, the defendant, J&G was caused to issue a Form 1099-MISC to the Bradley Law Firm LLC reflecting the payment of non-employee compensation of $255,000.

96.     In or about January 2003, WILLIAM BRADLEY, the defendant, willfully failed to issue to JOHN B. OHLE III, the defendant, an IRS Form 1099-MISC for the $46,000 payment to OHLE, which had been disbursed by BRADLEY on or about January 4, 2002.

## II.     THE CARPE DIEM FEES

97.     In conjunction with the employment of JOHN B. OHLE III, the defendant, prior to Bank A, OHLE established a business relationship with a wealthy client ("Client E"). Over time, OHLE provided general tax and estate advice to Client E, who resided in, among other places, Manhattan, New York, and Atlanta, Georgia. In or about late 1999, OHLE consulted with Client E about the possibility of setting up a charitable remainder trust. As a result of these discussions, and in response to OHLE's advice, Client E created a charitable remainder trust. This trust was initially funded with $5 million of which OHLE was the trustee. OHLE enlisted Individual B to provide OHLE with investment

43

advice regarding Client E's trust funds.

98.     In late 2001, JOHN B. OHLE III, the defendant, approached Client E and her husband with the idea of investing in Carpe Diem, for which Douglas Steger was an independent salesman.  Client E invested two separate amounts, one investment for $5 million under Client E's personal name and the other investment for $2 million in the name of Client E's trust.

99.     Additionally, JOHN B. OHLE III, the defendant, met with two other individuals regarding an investment in Carpe Diem.  Both of these individuals were 2001 HOMER clients of Bank A ("Client F" and "Client G").  They each invested $1 million in Carpe Diem at OHLE's recommendation.

100.    Clients E, F, and G were each charged a 5% commission on the Hedge Fund transactions.  Thus, the commissions for Client E's two investments were $250,000 and $100,000, respectively, and the commissions for Clients F and G's investments were $50,000 each.  JOHN B. OHLE III, the defendant, told Client E that he was not going to receive any commissions with respect to her investments.

101.    Notwithstanding these assurances, JOHN B. OHLE III, the defendant, caused $300,000 to be wired from Carpe Diem's bank account in Bermuda, through Citibank in Manhattan, New York, to Individual B's business bank account in San Francisco, California, on or about December 3, 2001.  On or about November 30, 2001, the other $50,000 was wired to a Chicago investment company for Douglas Steger's benefit.  The

44

instructions for these wire transfers were directed by OHLE through Douglas Steger.

102.   JOHN B. OHLE III, the defendant, instructed Individual B to wire $125,000 to the personal checking account of Individual A (the third-party buyer in the HOMER transaction) on or about December 4, 2001, and to wire $169,800 to OHLE's personal bank account in New Orleans, Louisiana, on or about December 5, 2001. Individual B retained the remaining $5,000.

103.   On or about December 7, 2001, $347,834.01 was wired to Individual B's business bank account from Carpe Diem's Bermuda Bank account, through Citibank in Manhattan, New York. To persuade Carpe Diem to transfer those funds, which belonged to Client E, to Individual B's account, JOHN B. OHLE III, the defendant, lied to a representative of Carpe Diem.

104.   Of this $347,834.01, JOHN B. OHLE III, the defendant, caused Individual B to wire on or about December 10, 2001, $97,834 to OHLE's personal bank account in New Orleans, Louisiana, and $250,000 to Individual A's personal checking account. Individual A used the $375,000 received in total from OHLE through Individual B to purchase the Unitrust Beneficiaries' interests in the execution of the HOMER transactions.

## Overt Acts

105.    The following overt acts, among others, were committed, and caused

to be committed, in the Southern District of New York, and elsewhere, by JOHN B. OHLE

III and WILLIAM BRADLEY, the defendants, and others in furtherance of the conspiracy

and to effect its objects:

a.      On or about December 7, 2001, OHLE caused a $347,834.01

wire transfer from Carpe Diem's bank account at the Bank of Bermuda to be sent to

Individual B's bank account at Bank of America, San Francisco, California.

b.      On or about December 10, 2001, OHLE caused a $97,834 wire

transfer from Individual B's bank account at Bank of America, San Francisco, California,

to OHLE's personal account at Hibernia National Bank, New Orleans, Louisiana.

c.      On or about December 28, 2001, Steger faxed the two invoices

for Clients A and B -- reciting purported "services rendered" -- from his home in Northfield,

Illinois to J&G's Offices in Chicago, Illinois, causing J&G on or about December 31, 2001,

to make two wire transfers in the amounts of $50,000 and $31,500 to Steger's account in the

name of AmCap at North Shore Community Bank, Wilmette, Illinois.

d.      On or about December 31, 2001, pursuant to a discussion with

OHLE, Steger issued from his AmCap account a check payable to cash in the amount of

$81,500, and therewith purchased a cashier's check for $81,500 made payable to OHLE.

STEGER subsequently provided said cashier's check to OHLE, which was deposited on or

about January 7, 2002, into a bank account in OHLE's name at Hibernia National Bank, New Orleans, Louisiana.

e.    On or about January 4, 2002, on OHLE's instructions, BRADLEY sent a wire transfer in the amount of $46,000 (OHLE's share of the $255,000 obtained by fraud) from BRADLEY's law firm bank account to a bank account of OHLE. OHLE failed to report the payment from BRADLEY to the IRS or his employer, Bank A.

f.    On or about January 14, 2002, BRADLEY wrote a $184,000 check (comprising the remainder of the $255,000) to JDC Group Inc, Individual C's company, from BRADLEY's law firm bank account at Hancock Bank, Hammond, Louisiana.

g.    On or about January 15, 2002, OHLE received a $100,000 commission from Carpe Diem via wire transfer into his personal bank account at Hibernia National Bank, New Orleans, Louisiana, from Carpe Diem's bank account at the Bank of Bermuda through Citibank, Manhattan, New York.

h.    On or about January 15, 2002, Steger received a $920,000 wire transfer into his AmCap bank account at North Shore Community Bank from Individual B's business bank account at Bank of America, San Francisco, California.

i.    On or about January 25, 2002, Steger wrote an $88,500 check made payable to OHLE's father, which was deposited into OHLE's bank account at Hibernia Bank, New Orleans, Louisiana.

j.      On or about February 18, 2002, Steger purchased a $620,000 cashier's check with funds from his AmCap bank account, which he deposited into his personal bank account at Glenview State Bank, Glenview, Illinois.

k.      On or about February 25, 2002, on OHLE's instructions, Steger wrote a $600,000 check made payable to "John Ohle" from Steger's personal bank account at Glenview State Bank, falsely describing the payment as a "personal loan" on the memo line of the check. OHLE thereafter deposited the check into his own account at MB Financial, Chicago, Illinois.

l.      On or about February 26 and 27, 2002, on OHLE's instructions, Steger withdrew $9,000 in cash on each of the aforesaid days from his AmCap bank account and gave the $18,000 in cash to OHLE for use during a Hawaiian vacation he was then about to take.

m.      On or about October 16, 2002, OHLE filed a false and fraudulent U. S. Individual Income Tax Return, Form 1040, for the calendar year 2001, on which he failed to report at least $642,634 in income, and thereby substantially understated his true taxable income and tax due and owing for the 2001 tax year.

n.      On or about April 15, 2003, BRADLEY failed to file a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2001, on which he was required to report the $20,000 he received for his participation in the unlawful referral fee scheme.

o.      On or about October 15, 2003, OHLE filed a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for the calendar year 2002, on which he failed to report income of at least $1,439,406, including over $700,000 in ill-gotten referral fees, and reported phony losses of $1,201,186 in order to eliminate the taxes on his reported income, and thereby substantially understated his true taxable income and tax due and owing for 2002.

p.      On or about October 27, 2003, Individual C filed a false and fraudulent U.S. Income Tax Return for an S Corporation, Form 1120S, for JDC Group, Inc., for the calendar year 2002, on which he reported the $184,000 received from BRADLEY, but, at OHLE's suggestion, offset the income with false expense deductions.

q.      On or about February 15, 2004, on OHLE's instructions and with his assistance, Steger filed a false and fraudulent joint U.S. Individual Income Tax Return, Form 1040, for the calendar year 2002, (i) on which he reported the full amount of the $920,000 transferred to him as income, when, as Steger well knew, over $700,000 was income not to him but to OHLE, and (ii) on which he deducted phony tax shelter losses of $908,999.

(Title 18, United States Code, Section 371.)

49

## COUNT SIX

(Tax Evasion: 2001 Tax Year – Defendant JOHN B. OHLE III)

The Grand Jury further charges:

106.　Paragraphs 1-18, 23, 24, 74-79, and 86-105 of this indictment are realleged and incorporated by reference as though fully set forth herein.

107.　From on or about January 1, 2001, through on or about October 16, 2002, in the Southern District of New York and elsewhere, JOHN B. OHLE III, the defendant, unlawfully, willfully, and knowingly did attempt to evade and defeat a substantial part of the income taxes due and owing by OHLE to the United States of America for the calendar year 2001 by various means, including, among others, (a) concealing the receipt and disposition of income through the use of various nominees; (b) preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed with the IRS, a false and fraudulent U. S. Individual Income Tax Return, Form 1040, for the calendar year 2001, which return falsely omitted income of at least $642,634, which falsity caused OHLE to substantially understate his taxable income and tax due and owing for the 2001 tax year.

(Title 26, United States Code, Section 7201.)

**COUNT SEVEN**

(Tax Evasion: 2002 Tax Year – Defendant JOHN B. OHLE III)

The Grand Jury further charges:

108.   Paragraphs 1-18, 23, 24, 74-79, and 86-105 of this indictment are realleged and incorporated by reference as though fully set forth herein.

109.   From on or about January 1, 2002, through on or about October 15, 2003, in the Southern District of New York and elsewhere, JOHN B. OHLE III, the defendant, unlawfully, willfully, and knowingly did attempt to evade and defeat a substantial part of the income taxes due and owing by OHLE to the United States of America for the calendar year 2002 by various means, including, among others, (a) concealing the receipt and disposition of income through the use of various nominees, including defendant WILLIAM BRADLEY; (b) preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed with the IRS, a false and fraudulent U. S. Individual Income Tax Return, Form 1040, for the calendar year 2002, which return (i) falsely omitted income of at least $1,439,406; and (ii) falsely claimed losses from a fraudulent tax shelter transaction, which falsities caused OHLE to substantially understate his taxable income and tax due and owing for the 2002 tax year; and (c) causing the issuance of a false and fraudulent opinion letter issued in connection with OHLE's tax shelter transaction.

(Title 26, United States Code, Section 7201.)

51

defendants are jointly and severally liable;

       b.    All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 940 Chestnut Avenue, Wilmette, Illinois 60091, more particularly described as the single-family home owned by OHLE;

       c.    All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 837 Royal Street, Unit K, New Orleans, Louisiana 70116, more particularly described as a condominium owned and controlled by OHLE and titled in the name of Dalton-Ohle Investment Property Trust;

       d.    One 2001 Upper Deck SP Legendary Cuts Player Cap Anson Baseball Card;

       e.    Five PSA 10 2001 SP Authentic Tiger Woods Cards, more particularly described as: Signs of the Times Gold, numbered to 25; Rookie Card number 45 Gold Parallel, numbered to 100; Rookie Card number 45, numbered to 900; Tour Swatch; and Tour Swatch Gold, numbered to 25;

       f.    All United States currency funds or other monetary instruments credited to account number 9006623694 in OHLE's name at Hibernia National Bank, New Orleans, Louisiana; and

g.    All United States currency funds or other monetary instruments credited to account number 5000000308 in OHLE's name at MB Financial Bank.

### Substitute Asset Provision

113.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property, including but not limited to the following: sports memorabilia collection of JOHN B. OHLE III, the defendant, including items held in the entity names "Museum of Sports History," "Festivus for the Rest of Us, Inc.," and "JSJD Grantor Trust."

(Title 18, United States Code, Section 981, and
Title 28, United States Code, Section 2461)

*Michael J. Garcia*

MICHAEL J. GARCIA
United States Attorney

54